## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## PLANTERS PEANUTS, a Division of Standard Brands, Inc., Respondent.

### No. 77-1764.

United States Court of Appeals,
Eighth Circuit.

Submitted March 16, 1978.

Decided March 31, 1978.

Patricia C. Matthews, Atty., N. L. R. B., Washington, D. C., for petitioner; John S. Irving, Gen. Counsel; John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel; Elliott Moore, Deputy Associate Gen. Counsel; and Janet C. McCaa, Atty., N. L. R. B., Washington, D. C., on briefs.

Marvin C. Wahl, of Wahl & Wahl, Baltimore, Md., on brief for respondent.

Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C. filed appendix.

Before ROSS and HENLEY, Circuit Judges, and LARSON,* Senior District Judge.

PER CURIAM.

This application for enforcement was brought by the National Labor Relations Board to enforce its order directing Planters Peanuts, a Division of Standard Brands, Inc., to post a notice that it would not interfere with, restrain, or coerce employees in their right to self-organization, to bargain collectively, to engage in concerted activities, or to refrain from those activities. It also ordered a new election.

The sole complaint against this employer is that it failed to give employees a scheduled wage increase prior to a representative election. It is alleged that the employer withheld the scheduled wage increase to coerce the employees to vote against the union.

The Administrative Law Judge held that the complaint should be dismissed in its entirety. The Board, by a split vote, reversed and ordered that the notice be posted and a new election be held.

* The Honorable EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

We have studied the opinions of the Administrative Law Judge and the Board, together with the underlying evidence presented to them and the applicable case law. We believe that the complaint should have been dismissed as the Administrative Law Judge recommended. We accord great weight to his interpretation of the facts. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 474, 95 L.Ed. 456 (1951).

We therefore decline to enforce the order of the Board for the reasons set forth in the Administrative Law Judge's opinion, a copy of which is attached hereto as an appendix to this opinion.

APPENDIX

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES

PLANTERS PEANUTS, A DIVISION OF
STANDARD BRANDS, INC.

and

INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMAN AND HELPERS
OF AMERICA, LOCAL UNION NO. 373

Cases 26–CA–6315
26–RC–5326

*Pargen Robertson, Esq.*, for the
  General Counsel.
*Marvin Wahl, Esq.*, of Baltimore, MD,
  for the Respondent.
*Cecil Douthitt*, for the Charging Party.

## DECISION

### Statement of the Case

BERNARD NESS, Administrative Law Judge: Case 26–CA–6315 is based upon a charge filed by the above-named Union on September 17, 1976, and a complaint which issued on October 22, 1976, against Planters Peanuts, A Division of Standard Brands, Inc., hereinafter called the Respondent, alleging that Respondent engaged in unfair labor practices within the meaning of Section 8(a)(1) of the Act, by withholding implementation of a new wage plan because of a union petition.

Case 26–RC–5326 is based on a petition filed on August 12, 1976, by the above-named Union for certification as the collective-bargaining representative of the Respondent's employees. Pursuant to a Stipulation For Certification Upon Consent Election, approved by the Acting Regional Director on August 31, 1976, an election was conducted by the Board on September 10, 1976. The tally of ballots showed approximately 313 eligible voters and that 291 ballots were cast, of which 73 were for Petitioner Teamsters Union, 4 were for Intervenor, Food Handlers Local 425, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, and 212 votes were cast against the participating labor organizations. The Teamsters Union thereafter filed timely objections to the election which, in substance, alleged that the Respondent interfered with the holding of a fair election by conduct similar to that alleged as an unfair labor practice in Case 26–CA–6315. Inasmuch as the Union's objections to the election encompassed similar conduct upon which the Regional Director

issued the complaint in Case 26–CA–6315, the Regional Director, with approval by the Board, issued an order consolidating both cases for hearing before an Administrative Law Judge.

These consolidated cases were tried before me in Fort Smith, Arkansas, on December 14, 1976. Upon the entire record, including my observation of the witnesses, and after due consideration of the briefs filed by the parties, I make the following:

## Findings of Fact

### I. Jurisdiction

The Respondent Company is a corporation doing business in the State of Arkansas with an office and place of business located in Fort Smith, Arkansas, where it is engaged in the processing of peanuts. During the 12 months preceding the issuance of the complaint herein, Respondent, in the course of its business operations, purchased and received at its Fort Smith, Arkansas location products valued in excess of $50,000 directly from points located outside the State of Arkansas, and during the same period of time Respondent sold and shipped from its Fort Smith, Arkansas location products valued in excess of $50,000 directly to points located outside the State of Arkansas. Respondent admits, and I find, that it is an employer engaged in commerce within the meaning of Section 2(2), (6) and (7) of the Act.

### II. The Labor Organization Involved

The International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local Union No. 373 is a labor organization within the meaning of Section 2(5) of the Act.

### III. The Alleged Unfair Labor Practices and the Objections to the Election

#### A. *The Issues*

(1) Whether Respondent violated Section 8(a)(1) by withholding implementation of a wage adjustment plan pending the outcome of the election.

(2) Whether the objections to the election filed by the Union should be sustained and the election set aside.

#### B. *Company Practice Regarding Wage Increases, and its Application to the Fort Smith Plant*

It had been the company for at least 15 months prior to the hearing that a formal wage survey be undertaken at all its plants at least once each year. The procedure required the personnel manager of each plant to make a local wage survey and to present recommendations to the plant manager. After reviewing the survey, the plant manager presents his recommendations to Ronald K. Finley, the Respondent's vice president of manufacturing. After consideration of the survey and recommendations, Finley gives final approval to any change in wage scales.

This procedure was first applied at the Fort Smith plant in September 1975. Although production had not yet begun, the plant employed 23 persons used in various cleanup and maintenance capacities. The personnel manager, Sidney Perceful, prepared a wage survey and made recommendations for wage adjustments directly to Finley, because the plant manager had left. Finley did not accept her recommendations, but approved various wage changes effective October 6, 1975.

Production began in January 1976 under Morris E. Boren, the new plant manager. In April 1976, it came to the attention of Boren that the Teamsters, as well as several other unions, were engaged in organizing Respondent's plant.

#### C. *Preliminary Movements Toward a Wage Increase*

In May 1976, Boren responded to a question at an employee meeting that a new wage survey would be undertaken and that when it was completed he would announce what wage adjustments, if any, would be made. The wage survey was not begun until late July 1976, because Personnel Manager Perceful had undergone major surgery, followed by a vacation.

In June 1976, Plant Manager Boren attended a corporation budget meeting at Suffolk, Virginia, which included a discussion about projected wages and wage adjustments for the Forth Smith employees in the last part of 1976. As a result of the discussion, a 10 percent wage adjustment figure, 8 percent salary and 2 percent fringe was projected for budget purposes only.

Thereafter, on August 13, 1976, Boren posted a notice informing the employees that "We are planning to have a general meeting the last week of August to announce the wage adjustment resulting from our wage survey."[1] On August 16, 1976,

[1] Boren was unaware at the time that a petition had been filed. He knew though that Finley was due at the plant on August 18 to finalize a wage adjustment.

Personnel Director Perceful concluded the wage survey by submitting the wage survey report to Plant Manager Boren.

### D. *The Decision Not to Implement the Wage Increase*

Vice President Finley had planned a trip to the Fort Smith plant for August 18, 1976, for the purpose of considering the wage survey, the recommendations of plant management, and then finalizing the wage adjustment. But Finley learned on August 13 from Respondent's counsel that a petition for an election had been filed by the Union, and thus he requested counsel to accompany him on the August 18 trip to Fort Smith.

At 9 a.m. on August 18, before meeting with Finley, Boren held a meeting attended by seven employees. Boren informed them that when Finley arrived he would discuss the wage survey and that Boren expected to have a decision by the end of Finley's visit.

The Respondent's representatives then met at the plant on August 18 to review the events described above. On the advice of counsel, Finley decided to stop consideration of the anticipated wage adjustment. He based his decision on several factors, such as a union handbill circulated at Respondent's plant stating that the Company would violate Federal law by granting wage increases to keep the Union out, and a posted "Notice to Employees from the National Labor Relations Board" where given as an example of conduct which may result in setting aside of an election was, "Promising or granting promotions, pay raises, or other benefits, to influence an employee's vote by a party capable of carrying out such promises." In addition, the Union had already filed two unfair labor practice charges against the Company. Therefore, in order to avoid the possibility of further unfair labor practice charges, as well as possible objections to the election, the Respondent decided to withhold any contemplated wage increases until after the election.

Following this decision, Boren posted a Notice to Employees on August 20 stating:

We have been instructed by our legal counsel that because of the union's petition we cannot legally proceed to put a new wage schedule into effect at this time. The union has already filed two unfair labor practices against the company. Neither of these has any merit because we have acted legally and fairly and we will continue to do so.

Again, let me say that the union's action means that we have to hold up the new wage plan until the election is over and the company is legally able to put it into effect. We will do our best to see that the vote is held quickly so that we can continue with our program of progress.

### *Events Subsequent to the Decision Not to Implement the Wage Increase*

By August 23 the parties had agreed to an election to be held September 10, and the employees were so informed. Boren addressed all the employees on August 25 from a prepared text[2] and then responded

[2] Respondent's Exhibit 8.

to questions. In the prepared text, he stated, *inter alia*, "Should any union be approved by you to represent you in dealings with the company, your wages and benefits will have to be negotiated. No existing

wage or benefit establishes a precident [sic]." Boren told the employees the wage survey was completed but because of the petition for an election, nothing would be done about it until after the election. He stated that if the Respondent followed up on its wage survey, the Union would file unfair labor practice charges alleging the company was attempting to buy the employees' votes. He told the employees if the Respondent was the winner in the election, it would proceed with its programs, "the wage survey being one of them." He also told the employees that if the Union won the election, the Company was "going to negotiations with the Union based on wages and all other facets of our business."

On September 13, Boren posted a notice containing the results of the election, which the Union lost by a substantial margin. The notice pointed out that the results were unofficial, and then stated:

> We have not forgotten about the wage survey which was frozen when the Union filed its petition for election. As soon as the official certification that the Company won is issued, we will let you know. In the meantime, we thank you for your vote of confidence.

After the Respondent received notice of the charge and the objection filed by the Union, it notified the employees on September 20 that "Everything must be put on hold" until the Board issued its certification.

On October 6, 1976, a story appeared on the first page of a local newspaper that a spokesman for the Board refused to comment on "how long the NLRB will take before deciding whether to certify a Union Election" that had been conducted at the plant. Following the appearance of the article and because of the restlessness of the employees about the status of the certification and wage increase, Boren urged Finley to take some action regarding wages. With Finley's permission, Boren posted a notice informing the employees that the "wage review" would be completed and all wage increases would go into effect as of September 13, 1976.

Following 2 working days' deliberation between Finley and Boren, Finley decided to grant the Fort Smith employees an across-the-Board increase of 34 cents per hour. Boren had recommended not to follow Perceful's recommendations. The final figure was a compromise between Boren and Finley.

## IV. Discussion and Analysis

### A. The Alleged 8(a)(1) Violation

The complaint alleges that Respondent withheld implementation of a new wage plan because its employees joined or assisted the Union. The General Counsel relies upon the principle that "An employer's legal duty in deciding whether to grant benefits while a representation case is pending is to determine that question precisely as he would if the Union were not in the picture."[3]

[3] McCormick Longmeadow Stone Co., Inc., 158 NLRB 1237, and other cited cases.

Therefore, according to the General Counsel, since Respondent had decided to grant a wage increase before it received notice of the Union petition for an election, its decision not to implement such an increase because of the presence of the Union was a violation of Section 8(a)(1).

Respondent contends that it had *not* reached a decision to implement a specific wage plan at the time it decided to postpone any possible increases until after the election. It asserts that the General Counsel has failed to prove that its motivation for withholding the wage increase was to influence its employees to vote against the Union, and affirmatively argues that the employees were fully aware of the reason for withholding any contemplated wage increases.

The contentions of the parties are illustrative of the potential confusion in the rules that can make it illegal to *withhold* a wage increase and at the same time make it illegal to *grant* that same increase. An employer who has been contemplating or planning a wage increase, and subsequently learns of a union petition for an election among his employees, is placed between the proverbial "devil and the deep blue sea."

He can grant the wage increase and face the risk of unfair labor practice charges and/or objections for trying to buy off his employees, or he can withhold the increase and face similar charges and/or objections for trying to influence the vote of his employees in the election. The Supreme Court summarized the problem in the following words:

> The danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove. Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged, *N.L.R.B. v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964).

The basic approach to this problem by the Board in numerous cases follows the reasoning of *Gates Rubber Co.*, 182 NLRB 95, which utilizes the simple standard that the employer must proceed as if the Union were not on the scene.

The Board in *Sugardale Foods, Inc.*, 221 NLRB 1228 (1975) focused upon the motivation of the employer who withheld wage increases to several employees who became eligible for increases just before the election. It had been the Employer's consistent past practice to consider employees for wage increases on the anniversary dates of their employment. The Board reversed the Regional Director's decision to set aside the election, stating that:

> We find no evidence that the employer sought to undermine the position of the Union or to influence the votes of employees in the impending election by deferring the increases, or that the employees believed such to be the case.

Similarly, the Board in *Heckethorn Mfg. Co.*, 208 NLRB 302, 306, aff'd. 504 F.2d 425 (C.A. 6, 1974), found no violation where there was "no indication that the company intended the withholding of the wage increase to have an effect upon the outcome of the election, or that the employees believed such to have been the case." See also *Uarco, Inc.*, 169 NLRB 1153 (1968).

In the instant case, although the wage survey had been completed in the Fort Smith plant, and Plant Manager Borden had formulated his own recommendations to present to Finley on August 18, no decision had been reached as to the amount of a wage increase, if any, nor the exact date for such an increase, by the individual who had the ultimate authority to do so—Finley. Although Finley went to Fort Smith on August 18 with the knowledge of the union petition, he took no action regarding formulating an increase, but rather reached a determination that to implement any wage increase prior to the election would be too hazardous a course under the circumstances. This decision was reached in good faith after consideration of several factors, such as the union handbill, the Board notice and the previous unfair labor practice charges filed by the Union.

The fact that the Respondent had budgeted an anticipated wage increase in June 1976 for the last part of 1976 is also immaterial as far as proving that Respondent had formulated a definite wage plan as of the time it announced that it would put off any possible increases. The 10 percent figure was merely for the purpose of establishing projected budget goals and was not a definite decision to grant a certain wage increase as of a particular time.

Although it was made clear to the employees by the Respondent's communications to them that it was the filing of the petition that caused the moratorium on any wage adjustment, it cannot be said that the deferral was coercive in nature or that the Respondent was trying to undermine the Union, or attempting to influence the votes of the employees, particularly when it referred to other unfair labor practice charges against it and expressed its concern that additional charges would be filed were it to make the wage adjustments before the election.

Under the facts and circumstances of this case, I find that the withholding of the wage adjustment did not violate Section 8(a)(1) of the Act.

**B.** *The Objection to Conduct Affecting the Results of the Election*

For the reasons expressed above, and because the Respondent's conduct did not create an atmosphere which interfered with the employees' exercise of a free choice in the election, I shall recommend the objection be dismissed and that the Board issue a certification of results of the election.

### V. Conclusions of Law

1. Respondent is an employer engaged in commerce and in operations affecting commerce within the meaning of Section 2(6) and (7) of the Act.

2. The General Counsel has not established by a preponderance of the evidence that the Respondent has engaged in unfair labor practices within the meaning of Section 8(a)(1) of the Act as alleged in the complaint.

Upon the basis of the foregoing findings of fact, conclusions of law, and the entire record in this case, and pursuant to Section 10(c) of the Act, I hereby issue the following recommended:[4]

[4] In the event no exceptions are filed as provided by Section 102.46 of the Rules and Regulations of the National Labor Relations Board, the findings, conclusions, and the recommended Order herein shall, as provided in Section 102.48 of the Rules and Regulations, be adopted by the Board and become its findings, conclusions, and Order, and all objections thereto shall be deemed waived for all purposes.

### ORDER

The complaint is dismissed in its entirety.

It is further recommended that the objection to conduct affecting the results of the election be dismissed and that a certification of the results of the election be issued.

Dated, Washington, D. C. April 19, 1977

/s/ <u>Bernard Ness</u>
Bernard Ness
Administrative Law Judge